## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| CHRIS TEMPLETON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:18-cv-02003-DCN |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| THE BISHOP OF CHARLESTON, a | ) | |
| Corporation Sole, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on defendant The Bishop of Charleston's (the "Bishop") motion for summary judgment, ECF No. 72. For the reasons set forth below, the court grants the motion in part, holds the motion in abeyance in part, and orders supplemental briefing.

## I.   BACKGROUND

Chris Templeton ("Templeton") is an adult citizen and resident of Georgia who alleges that he was sexually abused as a child by a priest of the Bishop, Raymond DuMouchel ("DuMouchel"). According to Templeton, the sexual abuse occurred after he traveled to South Carolina with a priest of the Diocese of Savannah, Wayland Yoder Brown ("Brown"), notorious for his molestation of children. On July 20, 2018, Templeton filed the instant action against the Bishop, the corporate entity of the Roman Catholic Church in South Carolina. Templeton brings negligence and gross negligence causes of actions against the Bishop, including maintaining conditions dangerous to children, negligent supervision of DuMouchel, and breach of assumed duty.

1

On March 1, 2021, the Bishop filed the instant motion for summary judgment. ECF No. 72.  On March 22, 2021, Templeton responded, ECF No. 80, and on March 29, 2021, the Bishop replied, ECF No. 87.  On May 6, 2021, the court held a hearing on the motion and resolved to hold it in abeyance until resolution of the parties' pending Daubert motions.  ECF No. 93.  On August 5, 2021, the court entered an order on those motions.  ECF No. 100.  As such, the motion for summary judgment has been fully briefed and is now ripe for review.

## II.  STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

### III.  DISCUSSION

The Bishop asks that the court grant summary judgment in its favor with respect to all Templeton's claims and causes of action.  The Bishop asserts five grounds in support of its motion: (1) Templeton released all claims against the Bishop in a prior settlement agreement; (2) the Bishop did not owe Templeton a duty of care under South Carolina negligence law; (3) Templeton's claims are barred by the statute of limitations; and (4) Templeton's "Maintaining Conditions Dangerous to Children" cause of action has no basis in South Carolina law.  The court addresses each of these grounds below.

#### A.  Release of Claims

The Bishop first argues that it is entitled to summary judgment because Templeton released the Bishop from liability for all claims in the instant action under a settlement agreement reached in a prior lawsuit, Templeton v. The Roman Catholic Diocese of Savannah, No. 2015-CP-27-00126.  On January 5, 2021, the Bishop moved to amend its answer to assert this affirmative defense of release.  ECF No. 62.  On April 13, 2021, the court denied the Bishop's motion to amend, finding that its delay in bringing the motion to amend was not justified by good cause.  ECF No. 92.  In the instant motion, the Bishop relies on this affirmative defense of release as his first basis for summary judgment.  The court finds that such reliance is improper in light of the court's order denying the Bishop leave to amend.  Nevertheless, the court indulges the Bishop with a waiver analysis below.

A defendant bears the burden of affirmatively pleading an affirmative defense. See Fed. R. Civ. P. 8(c)(1); Eriline Co. S.A. v. Johnson, 440 F.3d 648, 653 (4th Cir. 2006).  Rule 8(c)(1) expressly requires the defense of release to be asserted as an

3

affirmative defense.  Generally, the "failure to plead an affirmative defense as required by Federal Rule 8(c) results in the waiver of that defense and its exclusion from the case . . . ."  SunTrust Mortg., Inc. v. United Guar. Residential Ins. Co. of N.C., 508 Fed. App'x. 243, 252 (4th Cir. 2013) (quoting 5 Wright & Miller, Fed. Prac. & Proc. Civ. § 1278 (3d ed. 2012)).  A waiver of an affirmative defense "however, should not be effective unless the failure to plead resulted in unfair surprise or prejudice."  S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins. Co., 353 F.3d 367, 373 (4th Cir. 2003).

The parties do not address the issues of unfair surprise and prejudice in their summary judgment papers. However, the parties did address the issue of prejudice in their briefings on the Bishop's motion to amend its answer to assert the affirmative defense of release. [1]  See ECF Nos. 62, 63, 64.  In his response to the motion to amend, Templeton argued that he would be prejudiced by the Bishop's belated assertion of the affirmative defense of release because "further discovery most probably will be necessary to prove the intentions of the parties in entering into the agreement."  ECF No. 63 at 10.  Templeton explained that additional discovery would be particularly problematic given that the parties have engaged in discovery for three years only with respect to the alleged rape and molestation at issue.

The court agrees and finds that the Bishop waived the affirmative defense of release.  The Bishop's late assertion of the release defense would be prejudicial or at least constitute unfair surprise.  "[P]rejudice can result where a proposed amendment

---

[1] The court did not reach the issue of prejudice in resolving the Bishop's motion to amend because it found that the Bishop's request to amend was not justified by good cause under Federal Rule of Procedure 16(a).  ECF No. 92.  Because the court may consider the entire record on a motion for summary judgment, it considers the parties' prior prejudice arguments here in the context of waiver.

raises a new legal theory that would require the gathering and analysis of facts not already considered by the opposing party, but that basis for a finding of prejudice essentially applies where the amendment is offered shortly before or during trial." Johnson v. Oroweat Foods Co., 785 F.2d 503, 510 (4th Cir. 1986).  Discovery in this action closed on January 30, 2021, and dispositive motions were due on March 1, 2021. See ECF No. 57.  Because the Bishop did not affirmatively plead release as a possible defense in this action, the parties did not engage in any substantial discovery on the issue.  As discussed in the court's order denying the motion to amend, the Bishop delayed asserting its affirmative defense of release for over two years.  Now, three years into the litigation and after discovery has closed, the Bishop attempts to rely on a defense that it did not previously assert and that the court prohibited the Bishop from retroactively pleading in its answer, as a ground for summary judgment.  To permit the Bishop to inject this defense at this late date would significantly shift the focus of this litigation, afford Templeton no time to prepare to counter this defense, and potentially render the time and expense of several years of litigation a wasted effort.  Moreover, as explained above, the court denied the Bishop leave to amend his answer to assert that affirmative defense, and a finding to the contrary would be inconsistent with that decision.  As such, the court finds that the Bishop waived any reliance on the affirmative defense of release and therefore denies summary judgment on this issue.

### B.  Duty and Negligence

As a second ground for its motion, the Bishop argues that it is entitled to summary judgment on all Templeton's negligence causes of action because the Bishop did not owe Templeton a duty of care.  To establish a cause of action in negligence in

South Carolina, the following three essential elements must be proven: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty.  Rickborn v. Liberty Life Ins. Co., 468 S.E.2d 292, 298 (S.C. 1996).  In any negligence action, the threshold issue is whether the defendant owed a duty to the plaintiff.  See Daniel v. Days Inn of America, Inc., 356 S.E.2d 129, 131 (S.C. Ct. App. 1987).  Templeton's negligence/gross negligence causes of action include negligent supervision, breach of assumed duty, and maintaining conditions dangerous to children.  The court addresses all three negligence causes of action and the Bishop's duty with respect to each below.

### 1. Negligent Supervision

To begin, the Bishop argues that Templeton's negligent supervision claim fails as a matter of law because Templeton presents no evidence that the Bishop knew or should have known that DuMouchel posed a danger to Templeton or other children.[2]  In South Carolina, "[a]n employer owes a duty of care to a third party when the possible harm resulting to the third party by the employee could have been reasonably anticipated by the employer."  Rickborn, 468 S.E.2d at 299; see Degenhart v. Knights of Columbus, 420 S.E.2d 496–97 (S.C. 1992) (An employer can be liable for negligent supervision of an employee when an "employee intentionally harms another" on the employer's premises and "[the employer] (i) knows or has reason to know that he has the ability to control his [employee], and (ii) knows or should know of the necessity and opportunity for exercising such control.").  The key question in a negligent supervision claim is

---

[2] Templeton only alleges that the Bishop was negligent in its supervision of DuMouchel, and not Brown, because "Brown was not a priest of the Diocese of Charleston."  Compl. ¶ 18.

whether the employer knew or should have known of the danger the employee posed to others. Snowden v. United Rentals (N. Am.) Inc., 2015 WL 5554337, at *8, n. 6 (D.S.C. Sept. 21, 2015) (noting that the foreseeability requirement applies to pure negligent supervision claims). In other words, Templeton's negligent supervision claim is dependent on two basic elements: "knowledge of the employer and foreseeability of harm to third parties." Kase v. Ebert, 707 S.E.2d 456, 459 (S.C. Ct. App. 2011) (quoting Doe v. ATC, Inc., 624 S.E.2d 447, 450 (S.C. Ct. App. 2005)). "Although foreseeability is usually an issue of fact, the court should dispose of the matter on a dispositive motion when no reasonable factfinder could find the risk foreseeable or the employer's conduct to have fallen below the acceptable standard." Id. (internal quotation omitted).

The evidence that the Bishop knew or should have known of the risk of DuMouchel's sexual misconduct is insufficient to survive summary judgment. While Templeton cites evidence suggesting that the Bishop generally knew "there was a nest of pedophiles in the diocese," ECF No. 80 at 7, knowledge of a general concern of pedophilia within the church is not the same as knowledge that DuMouchel in particular posed a danger to others. To establish negligent supervision, the evidence must show that the Bishop had notice of its need to control DuMouchel specifically. See James v. Kelly Trucking Co., 661 S.E.2d 329, 330 (S.C. 2008) ("In circumstances where an employer knew or should have known that its employment of a specific person created an undue risk of harm to the public, a plaintiff may claim that the employer was itself negligent in hiring, supervising, or training the employee." (emphasis added)); Moore by Moore v. Berkeley Cnty. Sch. Dist., 486 S.E.2d 9, 13 (S.C. Ct. App. 1997) ("Absent

some evidence indicating notice to the District of [the employee's] inappropriate sexual proclivities, there is no basis to conclude the District knew or should have known of the necessity for supervising her conduct outside the classroom."). Therefore, for his negligent supervision claim to survive summary judgment, Templeton must put forth evidence that the Bishop should have anticipated DuMouchel's danger based on information specific to DuMouchel, such as his own history or behavior indicative of sexual misconduct.

Templeton does not argue that the Bishop had notice that DuMouchel engaged in any sexual misconduct prior to Templeton's abuse.[3] Rather, Templeton argues that the Bishop should have known that DuMouchel needed more oversight and supervision because he "was a troubled priest," "known to be insubordinate, destructive, and neglectful of his pastoral duties." ECF No. 80 at 19. Templeton cites various page numbers in DuMouchel's personnel file to support this assertion but does not elaborate on the actual content in the personnel file. After parsing through the file itself, the court does not find it consistent Templeton's characterization. ECF No. 80-6.

---

[3] In his factual overview, Templeton mentions that there were credible allegations against DuMouchel for sexual misconduct that occurred prior to Templeton's abuse:

> There were at least three allegations that DuMouchel had improperly abused young women at a Charleston Hospital in the 1950s. The allegations resulted in findings of probable cause by a General Sessions judge and criminal indictments against DuMouchel in 2005, but according to news reports, the charges were dropped when the prosecutor determined DuMouchel was incompetent to stand trial because of dementia. [] The Church settled the claims of those women and in 2011 and the current bishop, Robert Guglielmone, placed DuMouchel on a list of priests who had "credible" allegations of sexual abuse made against them.

ECF No. 80 at 5–6. However, Templeton does not argue or provide any evidence that the Bishop knew or should have known of these allegations before or during the timeframe of Templeton's alleged abuse, from August 1987 to May 1988.

With respect to Templeton's claim that DuMouchel was "insubordinate," Templeton refers to series of letters from Right Reverend George Lewis Smith ("Smith"), an apparent superior of DuMouchel, complaining about his hostile relationship with DuMouchel, including DuMouchel's "disapproval of practically everything I do and refus[al] to do many of the things [Smith] assign[ed] to him." ECF No. 80-6 at 12. The letters tend to show that DuMouchel did not get along with or follow Smith's directions, but does not suggest any physical violence or Smith's fear of the same. With respect to Templeton's characterization of DuMouchel as "destructive," from the pages cited by Templeton, the only evidence to support that assertion is a letter to Templeton stating, "His Excellency, Bishop Reh, would like to speak with you regarding the destruction of the log cabin at the Horse-creek Valley Welfare Center." ECF No. 80-6 at 16. The letter does not state or imply that DuMouchel destroyed the cabin. To support his characterization of DuMouchel as a "troubled priest," Templeton cites a letter from DuMouchel requesting a transfer from his parish in North Augusta, which DuMouchel explained was "for my own sanity, spiritual well-being and the salvation of my soul." ECF No. 80-6 at 19.

None of the evidence Templeton cites evinces that DuMouchel was dangerous or had any inappropriate sexual proclivities. Therefore, the evidence does not demonstrate that the Bishop knew of or should have known that DuMouchel posed a danger to third parties. Evidence that tends to show that DuMouchel was said to be "insubordinate" and "neglectful of his pastoral duties" does not equate to evidence that DuMouchel posed a danger of any physical harm to others—much less of sexually abusing children. Likewise, a reasonable factfinder could not find that DuMouchel was "destructive"

based on the evidence cited. A letter to DuMouchel generally discussing the
"destruction" of a cabin does not reasonably suggest that DuMouchel posed a
foreseeable risk of physical harm to others, especially when it does not indicate that
DuMouchel destroyed the cabin. Finally, no reasonable jury could infer that the Bishop
should have known DuMouchel was a danger to children based on his request to transfer
for his own "well-being." A factfinder would have to engage in impermissible
speculation, building inference upon inference, to conclude that the Bishop knew or
should have known that DuMouchel was a sexual predator based on the evidence of
record. As such, the evidence is insufficient to withstand summary judgment.

Alternatively, Templeton argues that DuMouchel was an agent of the Bishop,
such that DuMouchel's knowledge of his own risk of sexual misconduct should be
imputed to the Bishop. It is true that "the knowledge of an agent acquired within the
scope of his agency is imputable to the principal." Gandy v. Orient Ins. Co., 29 S.E.
655, 655 (S.C. 1898); see Rearden v. State Mut. Life Ins. Co., 60 S.E. 1106, 1106 (S.C.
1908). Templeton asserts that it is "[i]ndisputabl[e]" that "DuMouchel was an agent of
the corporation" as priest and parish administrator, ECF No. 80 at 16, and was acting in
the scope of his agency when he "opened the doors of St. Anthony's Mission Church []
to Brown and Templeton," id. at 2. Even accepting these propositions as true,
Templeton's imputed knowledge argument fails for two reasons.

First, Templeton provides no evidence that DuMouchel's knowledge of his own
sexual misconduct, or the risk thereof, was "acquired within the scope of his agency."
Gandy, 29 S.E. at 655. To determine whether knowledge was obtained in the scope of
agency, the proper inquiry is whether the knowledge was obtained "in the course of

the agency and by virtue of the authority as agent." Citizens' Bank v. Heyward, 133

S.E. 709, 713 (S.C. 1925) (internal citation omitted). "If the servant is doing some act in

furtherance of the master's business, he will be regarded as acting within the scope of

his employment, although he may exceed his authority." Jones v. Elbert, 34 S.E. 2d

796, 798–99 (S.C. 1945). "On the other hand, if the servant acts for some independent

purpose of his own, wholly disconnected with the furtherance of his master's business,

his conduct falls outside the scope of his employment." Crittenden v. Thompson–

Walker Co., 341 S.E.2d 385, 387 (S.C. Ct. App. 1986). "If a servant steps aside from

the master's business for some purpose wholly disconnected with his employment, the

relation of master and servant is temporarily suspended; and this is so no matter how

short the time, and the master is not liable for his acts during such time." Lane v.

Modern Music, Inc., 136 S.E.2d 713, 716 (S.C. 1964).

A reasonable jury could not conclude that DuMouchel learned of his own danger

of sexual misconduct in the course of and by virtue of his authority as priest and parish

administrator. Of course, the alleged sexual abuse of Templeton falls outside of the

scope of DuMouchel's agency, as it no way furthered the Bishop's business. Likewise,

DuMouchel's "open[ing] of the doors" to the church for the purposes of molesting

Templeton did not further the Bishop's business and cannot be said to fall within the

scope of DuMouchel's agency. Templeton does not provide any evidence that

DuMouchel opened the doors to Brown and Templeton in connection with any religious

service or program sanctioned by the Bishop; rather, the evidence suggests he opened

the doors for his own rogue use of the Bishop's premises. And even if DuMouchel did

open the doors as the Bishop's agent, as Templeton argues, it cannot reasonably be said

that DuMouchel obtained the knowledge of his own alleged inappropriate sexual proclivities by opening a door.  Therefore, as a matter of law, DuMouchel did not learn of Brown's or of his own danger to Templeton and other children in the scope of his agency, meaning that DuMouchel's knowledge of the danger to Templeton cannot be imputed to the Bishop.

Second, even assuming that DuMouchel obtained the relevant knowledge in the course of his agency, knowledge of his or Brown's risk of pedophilia would not be imputed to the Bishop under the adverse interest exception.  Under this exception, an agent's knowledge and wrongs are not imputed to the corporation when the agent's actions are entirely adverse to the corporation's interests.  Myatt v. RHBT Fin. Corp., 635 S.E.2d 545, 547 (S.C. Ct. App. 2006) (citing Little v. S. Cotton Oil Co., 153 S.E. 462, 463 (S.C. 1930)).  This exception makes good sense.  The rule of imputed knowledge stems from the presumption that an agent will disclose all information to his principal.  However, an agent cannot be presumed to have disclosed to his principal a matter that is entirely in the agent's interest and against that of the principal, as doing so would expose and defeat the agent's self-interested efforts.  Templeton has presented no evidence that the Bishop, as a corporation, derived any benefit whatsoever from DuMouchel and Brown's molestation of Templeton.  Indeed, common sense compels the opposite conclusion— the priest's misconduct could realistically only harm the Bishop, cause it reputational damage, and expose it to liability.  Based on the evidence in the record, DuMouchel's alleged sexually abusive conduct was entirely adverse to the Bishop as a matter of law, and as such, DuMouchel's knowledge of the same cannot be imputed to the Bishop.

In sum, no genuine issue of material fact exists as to whether the Bishop had knowledge—imputed or otherwise—that DuMouchel posed a threat of molesting children. The parties have been engaged in discovery for three years, and Templeton has failed to produce any evidence demonstrating that the Bishop knew or should have known that DuMouchel posed a danger to children. Nor has Templeton shown that the Bishop was otherwise negligent in supervising DuMouchel during his employment. A claim unsupported by meaningful evidence does not present a genuine issue for a jury to resolve and therefore cannot survive a motion for summary judgment. Therefore, the court grants summary judgment in favor of the Bishop on Templeton's negligent supervision claim.

### 2. Breach of Assumed Duty

The Bishop does not directly address Templeton's "Breach of Assumed Duty" cause of action but instead generally argues that South Carolina law does not impose a duty on the Bishop in connection with any of Templeton's negligence claims. Therefore, the court also considers whether the Bishop owed Templeton a duty of care under Templeton's "Breach of Assumed Duty" cause of action. Under this cause of action, Templeton alleges that:

> The [Bishop] made no effort, or no competent effort, to ascertain how many children DuMouchel had molested, and no effort, or no competent effort, to locate victims of DuMouchel such as [Templeton]. If the [Bishop] did make such an effort, [it] assumed the duty to locate victims of DuMouchel such as [Templeton], but performed it in a reckless or grossly negligent manner.

Compl. ¶ 45. In other words, Templeton alleges that (1) the Bishop had a "duty to locate" Templeton as a victim of DuMouchel and breached this duty by not making an effort to locate him; or, alternatively, (2) the Bishop voluntarily undertook the task of

13

locating victims of DuMouchel and breached that duty by not exercising care in its voluntary attempt to locate Templeton.

Neither party provides argument regarding a "duty to locate" victims of abuse in South Carolina. Instead, the parties frame the argument in terms of a duty to control or warn a third party of foreseeable harm. For example, the parties argue extensively about whether there was a "special relationship" between the Bishop and DuMouchel, as well as between the Bishop and Templeton. The existence of a "special relationship" between either the defendant and the injurer or the defendant and the victim provides an exception to the general rule that there is no duty to control the conduct of another or to warn a potential victim of danger. See Edwards v. Lexington Cty. Sheriff's Dep't, 688 S.E.2d 125, 128 (S.C. 2010).

The law of duty to warn and duty to control the conduct of another is inapplicable to Templeton's allegations that the Bishop had a "duty to locate" Templeton as a victim, the crux of Templeton's "Breach of Assumed Duty" cause of action. In defense of his "Breach of Assumed Duty" cause of action, Templeton simply reiterates his argument that the Bishop had a duty to protect Templeton from molestation by DuMouchel. This argument bears on Templeton's negligent supervision and maintaining conditions dangerous to children claims, not his "Breach of Assumed Duty" claim. Templeton fails to provide any argument or legal support for his "Breach of Assumed Duty" cause of action and likewise fails to put forth any evidence related to the Bishop's efforts, or lack thereof, to locate victims of DuMouchel. Therefore, the court grants the Bishop's motion for summary judgment with respect to this cause of action.

### 3.  Maintaining Conditions Dangerous to Children

The Bishop next argues that Templeton's cause of action for "Maintaining Conditions Dangerous to Children" has no basis in South Carolina law.  Therefore, to argue that it owed no duty under this cause of action, the Bishop employs public nuisance law.  Templeton alleges the Bishop is liable for "Maintaining Conditions Dangerous to Children" because it "implicitly represented to the plaintiff and other invitees to its premises[] that its facilities and its priests were safe, and that persons would be protected from harm when using its facilities and when interacting with its personnel."  Compl. ¶ 34.  Templeton further alleges that "the premises of the [Bishop] were not safe for children, due to lack of supervision of DuMouchel and due to their general awareness that sexual abuse of children had occurred repeatedly . . . ."  Compl. ¶ 35.

To support this cause of action, Templeton argues that "an owner or operator of a premises has a duty to guard against the criminal acts of a third party if they know or have reason to know that acts are occurring or about to occur on the premises."  ECF No. 80 at 14 (citing Shipes v. Piggly Wiggly St. Andrews, Inc., 238 S.E.2d 167, 169 (S.C. 1977), abrogated by Bass v. Gopal, Inc., 716 S.E.2d 910 (S.C. 2011)).  Templeton argues that the Bishop had a duty to protect against DuMouchel's sexual abuse on its property because it knew of DuMouchel's danger to children and "of a systemic problem of sexual abuse within the Diocese."  ECF No. 80 at 24.  Based on the allegations under this cause of action in the complaint and Templeton's supporting arguments, the court finds that Templeton's "Maintaining Conditions Dangerous to Children" cause of action sounds in premises liability.

South Carolina courts "have consistently imposed a duty on business owners to employ reasonable measures to protect invitees from foreseeable harm." Bass v. Gopal, Inc., 716 S.E.2d 910, 915–16 (S.C. 2011) (citing Allen v. Greenville Hotel Partners, Inc., 405 F. Supp. 2d 653, 659 (D.S.C. 2005) (holding that a business owner has a "duty to its guests to take reasonable action to protect them against unreasonable risk of physical harm")). When determining whether this duty to protect extends to criminal acts of third parties, South Carolina applies a balancing test. Id. at 915. "The balancing approach acknowledges that duty is a flexible concept, and seeks to balance the degree of foreseeability of harm against the burden of the duty imposed . . . . As such, the more foreseeable a crime, the more onerous is a business owner's burden of providing security." Id. (internal quotations and citations omitted). For a crime to be foreseeable, an owner need not have knowledge that a particular individual posed a risk of criminal conduct nor that its premises, or a particular individual thereon, would be targeted; knowledge of similar instances of criminal activity in the area may suffice. See Lord v. D & J Enterprises, Inc., 757 S.E.2d 695, 703 (S.C. 2014) (finding "there was a foreseeable risk of a shooting at Cash on the Spot given the rash of armed robberies that culminated in the shootings of store clerks and customers at nearby businesses"); Bass, 716 S.E.2d at 916 ("In this case, the especially high probability of crime at the Super 8 compared to the national and state averages raised at least a scintilla of evidence that the crime against Petitioner was foreseeable."). At least one South Carolina court has permitted a victim of a sexual abuse to bring suit under a premises liability theory. See Burns v. South Carolina Comm'n for the Blind, 448 S.E.2d 589 (S.C. Ct. App. 1994). Still, a property owner or operator "is generally not charged with the duty of protecting

its [invitees] against criminal acts of third parties [on its premises] when it did not know or have reason to know that such acts were occurring or about to occur." Munn v. Hardee's Food Sys., Inc., 266 S.E.2d 414, 414 (S.C. 1980) (citing Shipes, 238 S.E.2d at 167).

Templeton testified that he was abused by Brown and DuMouchel on multiple occasions from August 1987 to May 1988, each time on property owned and operated by the Bishop. See ECF Nos. 80-1; 80-5. The duty the Bishop owed Templeton depends on his status or classification upon entering the Bishop's premises and the foreseeability of the harm to him. Templeton argues that he was an invitee; the Bishop does not address the issue. As discussed above, the court finds that the Bishop did not have knowledge of the risk that DuMouchel himself posed to Templeton as a matter of law. However, as also discussed above, Templeton provides evidence that the Bishop had knowledge of a more general risk of sexual abuse on its premises. In particular, Father Timothy Watters ("Watters") testified that, around 1986, Bishop Ernest Unterkoefler ("Unterkoefler"), who served as the Bishop of Charleston at the time, told him that there was a "nest of pedophiles in the diocese" but "Rome" would not allow him "to get rid of them." ECF No. 80-3, Watters Dep. at 60:16–20.

The Bishop argues that the comment regarding the "nest of pedophiles" is inadmissible hearsay. To be entitled to consideration on summary judgment, evidence must be admissible. See Fed. R. Civ. P. 56(c); see also Sakaria v. Trans World Airlines, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment); Mitchell v. Data General Corp., 12 F.3d 1310, 1315–16 (4th Cir. 1993) ("The summary

17

judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof in the form of admissible evidence that could carry the burden of proof in his claim at trial.").  During the hearing, Templeton averred that the statement is admissible as an admission of a party opponent under Federal Rule of Evidence 801(d)(2)(D).  The Bishop did not address this argument.

Because the parties did not present arguments for the "Maintaining Conditions Danger to Children" cause of action under the applicable premises liability framework, the court orders supplemental briefing on the issue.  Specifically, the court orders supplemental briefing on: (1) Templeton's status or classification upon entering the Bishop's property; (2) the foreseeability of harm to Templeton based on Unterkoefler's statement that the diocese had a "nest of pedophiles," ECF No. 80-3 at 60; (3) whether Unterkoefler's "nest of pedophiles" statement is inadmissible hearsay or fits the requirements of a hearsay exception; and (4) if the harm to Templeton was foreseeable, the measures the Bishop was required to take to protect against that harm.  In the supplemental briefing, the parties shall be bound by the court's findings in this order and should frame their arguments accordingly.  The parties shall file their briefings no later than October 1, 2021.

### C.   Statute of Limitations and Repressed Memory

As a third ground for summary judgment, the Bishop argues that Templeton's claims are barred by the statute of limitations.  Oddly, neither party cites the applicable statute of limitations.  The Bishop asserts that the time for Templeton to bring his claims lapsed in November 1999, six years after he turned nineteen years old.  Id.  Templeton, on the other hand, does not address the number of years in the limitations period, but

simply argues that the statute of limitations was tolled by his repressed memory such that it did not begin to run until he first remembered DuMouchel's abuse in April 2017. As noted previously, Templeton filed the instant action in July 2018.

Without any argument to the contrary, the court finds that Templeton's claims fall under the statute of limitations provided for in S.C. Code Ann. § 15-3-555. This section provides that

> An action to recover damages for injury to a person arising out of an act of sexual abuse or incest must be commenced within six years after the person becomes twenty-one years of age or within three years from the time of discovery by the person of the injury and the causal relationship between the injury and the sexual abuse or incest, whichever occurs later.

S.C. Code Ann. § 15-3-555. To the court's knowledge, this statute, adopted in 2001, is the most recent statute of limitations on point for sexual abuse, and ordinarily, a new statute of limitations applies retroactively. Doe v. Crooks, 613 S.E.2d 536, 537–38 (S.C. 2005). Because Templeton filed the instant action over fourteen years after reaching the age of maturity and just over one year after his alleged recall of the abuse, Templeton's claims are time-barred unless his repressed memory tolled the statute of limitations. The parties, of course, dispute this issue.

The parties agree that Moriarty v. Garden Sanctuary Church of God is the seminal South Carolina case on the issue. 534 S.E.2d 672 (S.C. 2000). In Moriarty, the Supreme Court of South Carolina held that a "plaintiff may assert the discovery rule []⁴

---

[4] The court in Moriarty referred to the discovery rule contained in prior version of the statute of limitations, § 15-3-535, in this quotation. As previously noted, the applicable discovery rule in this case is set forth in § 15-3-555. Nevertheless, both discovery rules provide that a plaintiff may bring claims arising from sexual abuse within three years of discovery of that claim, such that the court finds Moriarty equally applicable to both.

in a case involving repressed memories of sexual abuse." Id. at 679 (footnote added). Accordingly, "a repressed memory plaintiff—like plaintiffs seeking to use the discovery rule in other cases—must bring her action within the required period after the date a reasonable person would have regained sufficient memories to discover her injury." Id. at 677; see Doe v. Bishop of Charleston, 407 S.C. 128 (S.C. 2014) (finding that the three-year statute of limitations tolled until date plaintiffs knew or reasonably should have known that negligent supervision had occurred). The discovery rule will apply if the plaintiff "can prove to the jury that a person of common knowledge and experience would not have been put on notice that she had a claim" until the date that the repressed memory was allegedly recovered. Id. at 678. Notice is an objective standard, judged by whether a reasonable person under the circumstances would have been on notice by a certain date. Id. The rule set forth in Moriarty "avoid[s] the harsh and unjust result of closing the courtroom doors a plaintiff whose 'blameless ignorance' resulted in a failure to pursue a cause of action within the limitations period." Id. at 678–679.

To apply the discovery rule in a case of repressed memory, the court in Moriarty established two requirements. First, a plaintiff must present objectively verifiable evidence to corroborate the existence of repressed memory. Id. at 680. Second, a plaintiff must use expert testimony to establish both the alleged abuse and the repressed memories. Id. The corroborating evidence requirement is intended to balance a plaintiff's interest in pursuing a valid claim and a defendant's interest in defending a stale or false claim. It also accounts for disagreement over the validity of repressed memory syndrome within the medical and scientific communities. The expert testimony

requirement, on the other hand, is grounded in the idea that repressed memory is a matter that lies outside the expertise of a lay person.

The Bishop initially argued that Templeton could not satisfy the <u>Moriarty</u> requirements because repressed memory syndrome "rests on unproved allegations; questionable science; and inadmissible testimony by [Templeton's] own experts."  ECF No. 72 at 9.  The court resolved the arguments concerning the science of repressed memory and admissibility of expert testimony in its order granting in part and denying in part the Bishop's motion to exclude Templeton's experts, ECF No. 100.  In that order, the court found that the science of repressed memory is sufficiently accepted by the medical profession and Templeton's expert testimony is admissible, with the exception of testimony that his treating therapists, Shelly Ainsworth, MSW ("Ainsworth") and Deborah Kearney, Ph.D. ("Kearney"), diagnosed him with dissociative amnesia. Therefore, the court only addresses the Bishop's remaining argument, that Templeton has failed to provide sufficient corroborating evidence or expert testimony to establish his abuse or repressed memory.

Templeton argues that he satisfies both the corroborating evidence requirement and the expert testimony requirement, and this court agrees with Templeton that his evidence is sufficient at the summary judgment stage under <u>Moriarty</u>.  Pursuant to <u>Moriarty</u>, corroborating evidence may include

> (1) an admission by the abuser; (2) a criminal conviction; (3) documented medical history of childhood sexual abuse; (4) contemporaneous records or written statements of the abuser, such as diaries or letters; (5) photographs or recordings of the abuse; (6) an objective eyewitness's account; (7) evidence the abuser had sexually abused others; or (8) proof of a chain of facts and circumstances having sufficient probative force to produce a reasonable and probable conclusion that sexual abuse occurred.

Id.  The court finds that Templeton has presented sufficient corroborating evidence to survive summary judgment with respect to the first requirement under Moriarty. Specifically, the following objective evidence has sufficient probative force to support a reasonable and probable conclusion that Templeton may have been sexually abused by DuMouchel: testimony from Templeton's therapists regarding their extensive treatment of Templeton for symptoms consistent with sexual abuse; Brown's guilty plea to multiple criminal indictments for sexual abuse;[5] a news report discussing three young women's allegations of sexual abuse by DuMouchel prior to 1986, ECF No. 80-7; and DuMouchel's assignment to the Bishop's list of priests that have been "credibly" accused of sexual abuse involving a minor, ECF Nos. 80-8, 80-9.

Templeton likewise satisfies the second requirement under Moriarty—expert testimony to prove the abuse and repressed memory.  Templeton offers expert testimony from Ainsworth and Kearney, two practicing clinical therapists who have treated Templeton and agree that repressed memories are a scientifically accepted phenomenon. Ainsworth and Kearney's depositions provide substantial evidence supporting Templeton's claims of both DuMouchel's abuse and Templeton's repressed memory. Specifically, both therapists testified that Templeton developed post-traumatic stress disorder ("PTSD") and other symptoms indicative of childhood trauma.  See, e.g., ECF No. 98, Kearney Dep. at 82:7–88:2; ECF No. 33, Ainsworth Dep. at 31:17–23; 42:10–45:25.  Kearney details Templeton's symptoms manifesting from his PTSD, including

---

[5] Although Brown's alleged sexual abuse of Templeton is not the basis of this action, the complaint alleges that DuMouchel abused Templeton in conjunction with Brown after Brown transported Templeton to South Carolina.  Therefore, credible allegations against Brown also constitute objective verification of Templeton's allegations of sexual abuse by DuMouchel.

nightmares, psychological "reactivity to triggers," "very strong psychological or physiological response" to intrusive thoughts and images, "persistent cognitive belief changes," "mood" issues, and "detachment."  Kearney Dep. at 61–62.  Kearney further explains how repressed memory "is common with PTSD" and that she observed Templeton's recurring inability to recall important information.  Id. at 66:22–23; 87:22– 88:2.  She discusses Templeton's bodily memory manifesting as physical symptoms paralleling the sexual abuse he experienced.  Id. at 64:16–24.  And she testified that she observed "congruence of emotion" and "continuity of story" in connection with Templeton's allegations of sexual abuse and repressed memory.  Id. at 40:2–13.  For example, Kearney reports that Templeton's exclamation of "Father Ray, Father Ray" when he came upon St. Anthony's Church in 2017 is an emotional outburst a therapist would expect from a person "coming into awareness" of past abuse.  Id. at 78:6–79:7.

Likewise, Ainsworth details Templeton's emotional damage, such as shame, fear, self-esteem issues, and depression; physical damage, including ulcerative colitis and rectal issues; and spiritual damage as all consistent with his allegations of childhood sexual abuse.  Ainsworth Dep. at 42:10–44:4; 55:11–14; 118:7–119:1.  She further explains how the "most common" defense mechanism when dealing with trauma is dissociation, and that Templeton continued to experience fractioned memory and significant memory impairment during treatment.  Id. at 18:3–5; 43:8; 44:20.  She bases her opinions on her experiences working with "hundreds and hundreds of trauma survivors."  Id. at 55:11–14.  Notably, Ainsworth testified that during the time she treated Templeton in 2014 and 2015, Templeton discussed Brown's abuse in detail but never mentioned DuMouchel's abuse.  Id. at 70:12–15.  Kearney testified that by the

23

time Templeton was referred to her at the end of 2017, Templeton recalled DuMouchel's abuse.  Kearney Dep. at 87:22–23.  Therefore, Templeton's reports of repressed memory of DuMouchel's abuse until April 2017 are consistent with his medical record.  Based on Ainsworth and Kearney's depositions, Templeton has provided sufficient expert testimony on his abuse and repressed memory to withstand summary judgment.

Overall, Templeton has presented sufficient evidence to create a genuine issue of material fact on the issue of repressed memory.  The credibility of Templeton's repressed memory claim, and by extension, whether it tolls the statute of limitations, is therefore an issue for a jury to decide.  The court cannot find at this juncture that Templeton's claims are barred by the statute of limitations as a matter of law.

## IV.   CONCLUSION

For the foregoing reasons, the court **GRANTS** the motion for summary judgment with respect to Templeton's negligent supervision and breach of assumed duty causes of action and **HOLDS IN ABEYANCE** the Bishop's request for summary judgment with respect to Templeton's cause of action for "Maintaining Conditions Dangerous to Children."  Further, the court **ORDERS** the parties to submit supplemental briefing by October 1, 2021 in accordance with this order.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 9, 2021**
**Charleston, South Carolina**